IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: § | | |
| § | | |
| MARGAUX WARREN PARK PARTNERS; § | | Case No. 08-43388 |
| § | | |
| Debtor. § | | |

| | | |
|---|---|---|
| MARGAUX WARREN PARK § | | |
| PARTNERS, LTD., WARREN 91, LLC, § | | |
| TODAY REALTY ADVISERS, INC., § | | |
| ERIC BRAUSS, DONALD § | | |
| SILVERMAN, § | | |
| § | | |
| Plaintiffs, § | | |
| § | | Adversary Proceeding |
| V. § | | No. _____ |
| § | | |
| GE BUSINESS FINANCIAL SERVICES, § | | |
| INC., f/k/a MERRILL LYNCH § | | |
| BUSINESS FINANCIAL SERVICES, § | | |
| INC., WILLIAM BALLENT, § | | |
| § | | |
| Defendants. § | | |

# PLAINTIFFS' ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

COME NOW Margaux Warren Park Partners, Ltd. ("Debtor"), Warren 91, LLC, Today Realty Advisors, Inc., Eric Brauss and Donald Silverman, (collectively "Plaintiffs") herein and file this their Plaintiffs' Original Complaint against GE Business Financial Services, Inc. f/k/a Merrill Lynch Business Financial Services, Inc. ("GE"), and William Ballent ("Ballent") and, in support thereof, would respectfully show unto the Court as follows:

___

## I. PARTIES

1. Debtor Margaux Warren Park Partners, Ltd. filed for Chapter 11 protection under the United States Bankruptcy Code on December 16, 2008, in the United States Bankruptcy Court for the Eastern District of Texas, Plano Division. Debtor is separately represented by its Chapter 11 counsel. The other Plaintiffs are individuals or entities organized under the laws of Texas or residing therein. Warren 91, LLC, is a general partner of the Debtor. Today Realty Advisors, Inc., Eric Brauss and Donald Silverman are guarantors on the loan which is the subject matter of this action as set forth below.

2. GE Business Financial Services, Inc., f/k/a Merrill Lynch Business Financial Services, Inc. ("GE") is a New York corporation that may be served by delivering process to its registered agent, CT Corporation System, which is located at 350 North St. Paul St., Dallas, Texas 75201.

3. William Ballent is a resident of Dallas, Texas. William Ballent ("Ballent") may be served by delivering process to him at 5319 Willow Wood Lane, Dallas, Texas 75252 or wherever else he may be found.

## II. JURISDICTION AND VENUE

4. Jurisdiction arises in the Eastern District of Texas Bankruptcy Court pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a). The claims and causes of action set forth arise under provisions of the bankruptcy code and are core proceedings within the meaning of § 157(b)(2) et seq. In the alternative, this court has jurisdiction to §

157(c) in that these claims will have a decisive impact upon the Debtor's rights and obligations in the bankruptcy case and affect, if not dictate, administration of the estate. This Court has jurisdiction over GE Business Financial Services, Inc. because it is registered to do business in Texas with the Texas Secretary of State, has maintained minimum contacts with and is doing business in Texas by lending money and providing attendant lender services to Texas residents on Texas real property, and has committed torts in Texas, all of which are the subject of this lawsuit. This Court has jurisdiction over Ballent because he is a Texas resident.

5. Venue is proper in Collin County, Texas, because all or a significant portion of the events giving rise to Plaintiffs' causes of action occurred in this county, Ballent is a resident of this county and because the real property at issue in this lawsuit and the primary asset of the Debtor's estate is located in this county.

### III. FACTS

6. This case concerns GE, the largest single creditor of the Debtor/Plaintiff. As Plaintiffs will demonstrate, GE is a predatory "loan to own" lender who attempted to steal the real property of Plaintiffs which is also the sole asset of the Debtor's estate, other than the value of the claims stated herein. (See Debtor's Schedules, dkt #9).

7. Don Silverman ("Silverman") is a principal of Margaux Development Company ("MDC"), a real estate development company located in Dallas, Texas, and organized under the laws of the state of Texas. MDC typically develops commercial, multi-family residential and mixed used real estate projects.

8. Eric Brauss ("Brauss") is a principal of Today Realty Advisors, Inc. ("TRA"), a real development company located in Dallas, Texas, and organized under the laws of the state of Texas. TRA typically develops commercial, multi-family residential and mixed used real estate projects.

9. MDC and TRA teamed up to do a mixed use real estate development in Frisco, Collin County, Texas, which is located at the corner of Warren Parkway and the Dallas North Tollway (the "Property").

10. The Property was owned by HCA, who planned to build a hospital facility on the Property. In March of 2007, Silverman learned that HCA no longer planned to build its hospital on the Property, and Silverman, through an entity he controlled -- Jade Acquisitions, Inc., (hereinafter, "Buyer") a Texas corporation -- made an offer to buy 91.645 acres. A purchase contract for the 91 acres was executed. The sale price for the Property was $30,375,000, and $250,000 was escrowed by the Buyer.

11. For the next two months, MDC and TRA began working to secure financing and investors for the Property and development thereof and otherwise prepare for the closing on the Property. Margaux Warren Park Partners, Ltd. ("Warren Park") was established to own the Property, and Warren 91, LLC was established to serve as the general partner of Warren Park. Today Tollway Land, L.P., an affiliate of Brauss, and Margaux Partners 2007, Ltd., an affiliate of Silverman, are the limited partners of Warren Park.

12. MDC and TRA had both used Metropolitan Capital Advisors, Ltd. ("MetCap"), a real estate investment banking firm, in the past, and they decided to again

___

use MetCap to assist them with securing a lender for this transaction. Plaintiffs and MetCap began talking with Merrill Lynch and Ballent, who worked for Merrill Lynch, about financing this transaction, a deal Merrill Lynch aggressively pursued. MDC, TRA and MetCap have all done business with the individuals at Merrill Lynch who worked on this loan, and based on their prior experience with and the representations of Merrill Lynch and the individuals at Merrill Lynch including Ballent, Plaintiffs decided to move forward with Merrill Lynch as the lender on this deal.

13. On May 22, 2007, Jade Acquisitions, Inc. assigned the purchase contract for the Property to Warren Park. On May 25, 2007, the closing on the purchase contract for the Property occurred (the "Closing"). The loan with Merrill Lynch was structured as a typical land development loan that provided for initial funding of a portion of the loan used to purchase the land and pay various fees, for monthly draws and for interest reserves. In association with the Closing, Warren Park entered into the following written agreements with Merrill Lynch Capital, a division of Merrill Lynch Business Financial Services, Inc. ("Merrill Lynch"):

    a. a Loan Agreement for a loan in the amount of $34,800,000 (the "Loan");

    b. a Deed of Trust, Security Agreement, Assignment of leases and Rents, and Fixtures Filing agreement for the benefit of Merrill Lynch to secure the Loan (the "Deed of Trust");

  c.  two Promissory Notes in favor of Merrill Lynch, one in the amount of $26,700,000 and one in the amount of $8,100,000 (the "Promissory Notes"); and,

  d.  various UCC financing statements.

14. Silverman, Brauss and TRA also executed guarantees in favor of Merrill Lynch for the amount of the debt (the "Guaranty"). Copies of the Loan, Deed of Trust, Promissory Notes and Guaranty are attached to Plaintiffs' Original Petition as <u>Exhibits "A" through "D"</u> and incorporated herein by reference as if set forth in full.

15. The loan package for this transaction included a number of standard fees, including equity placement fees for TRA, acquisition fees for Silverman and Brauss, a broker's fee for MetCap and approximately $400,000 in lender fees for Merrill Lynch. Merrill Lynch had issued a loan commitment and application with the terms of the Loan approximately 40 days prior to Closing. At all material times, Merrill Lynch knew the above-described fees that would be paid from the loan proceeds. A copy of the Loan Application is attached to Plaintiffs' Original Petition as <u>Exhibit "E"</u> and incorporated herein by reference as if set forth in full. Mere hours prior to Closing, Merrill Lynch claimed that the above-described fees were too high for its loan committee to approve unless it substantially changed the terms of the Loan package to require that Warren Park, by the first anniversary date of the Loan, to either: (a) make a $2,500,000 payment on the Loan; or, (b) have sold at least 10 acres of the land at $10.80 per square foot and have certain entitlements from the City of Frisco. Because Merrill Lynch waited until just prior to the Closing to change the conditions of the Loan, Plaintiffs, who had signed a

purchase contract for the Property on which the due diligence option period had already lapsed and who had invested a substantial amount of money preparing to close on the deal, had no choice but to accept Merrill Lynch's predatory, extortive changes to the Loan. In fact, had the Plaintiffs not accepted these onerous deal terms, they would be forced to default under the purchase contract, been deprived of purchasing the Property, and lost over $800,000 in fees and expenses incurred in anticipation of closing. Merrill Lynch essentially did a "bait and switch" on the Plaintiffs in connection with the terms of this Loan. Until this time, Plaintiffs' relationship with Merrill Lynch was one of trust.

16. After Closing, Plaintiffs immediately began working on putting together a package for the City of Frisco in order to secure the entitlements newly required by the Loan. In fact, Plaintiffs had a comprehensive package prepared and submitted to the City within 90 days' of Closing.

17. While Plaintiffs were working on the development of this Project, the economy in the United States took a downturn, in part because years of abusive lending practices finally caught up with a number of lenders, and the sub-prime lending market collapsed. Unbeknownst to Plaintiffs when they entered into this Loan, Merrill Lynch was heavily involved in predatory lending. Merrill Lynch was heavily invested in sub-prime loans at the time, and there was essentially a melt-down at Merrill Lynch, which culminated in Merrill Lynch being sold to Bank of America in a "fire sale" designed to avoid the bankruptcy filing that other large predatory lenders, like Lehman Brothers, had to make on the fateful September 15, 2008. Prior to its sale to Bank of America, in order to offset its losses, Merrill Lynch began selling its more profitable loans to raise capital.

The sale of these loans was usually at a significant discount. The Warren Park Loan was therefore sold as part of a business transaction,[1] and GE became the new "Lender." In addition, the individual bankers, including Ballent, that Plaintiffs and MetCap had worked with at Merrill Lynch either left or were terminated.

18. After GE bought the Loan, GE and the individuals at GE ratified and adopted what Merrill Lynch had started – GE embarked on their predatory plan to ultimately take the Property from Plaintiffs without compensation beyond the loan proceeds paid to date. In fact, unbeknownst to Plaintiffs, GE bought loans such as the Warren Park Loan from Merrill Lynch at a significant discount with the plan of ultimately owning the security for the loans. When GE bought the loans from Merrill Lynch, it cherry-picked the loans it wanted to take, based in part on the underlying security for those loans. Then, after GE owned the loans, GE began making it as difficult as possible for borrowers to fulfill their loan obligations and stay out of default. As soon as a borrower became in default, GE immediately sent out default notices and began taking steps to foreclose on the security for the loans. GE's "loan-to-own" predatory practices were no different for Warren Park.

19. By May of 2008, when Warren Park was due to either: (a) make a $2,500,000 payment on the Loan; or, (b) have sold at least 10 acres of the land at $10.80 per square foot and have certain entitlements from the City of Frisco, Warren Park still did not have all of the required approvals from the City. Warren Park did have a

---

[1] Claims against GE include any and all applicable claims against Merrill Lynch for acts and omissions that occurred during the time that Merrill Lynch was involved in this transaction prior to the name change from Merrill Lynch to GE in March of 2008.

_____
Plaintiffs' Original Complaint -- Page 8 of 20

commitment letter from one buyer to purchase 20 acres for at least $10.80 per square foot. Warren Park had also obtained certain zoning for the Property; however, it still lacked certain approvals from the City to meet the oppressive loan requirements. Though Warren Park had submitted all of the required paperwork to the City of Frisco by August of 2007 and though the City of Frisco repeatedly said it liked the proposed development, the City, through no fault of Warren Park's, had just not issued its final approvals.

20. Warren Park therefore went to GE, explained the situation with the City and asked for an extension. GE refused to even discuss the matter with Warren Park unless and until they signed a negotiating agreement, a copy of which is attached to Plaintiffs' Original Petition as <u>Exhibit "F"</u> and incorporated herein by reference as if set forth in full. Warren Park signed the agreement on June 12, 2008 and returned it to GE. Warren Park also made a written proposal to GE on June 19, 2008, a copy of which is attached to Plaintiffs' Original Petition as <u>Exhibit "G"</u> and incorporated herein by reference as if set forth in full.

21. When GE finally agreed to discuss Warren Park's requested extension, GE would only agree to give Warren Park a forbearance in which Warren Park was in default under the Loan. In exchange, GE agreed not to foreclose on its security interest until July 25, 2008. GE charged Warren Park $250,000 for this forbearance. At the time, Warren Park paid the $250,000 because GE led Plaintiffs to believe that they would work with Plaintiffs on modifying the Loan before the July 25, 2008 deadline. In addition, Warren Park paid the $250,000 fee because GE led Plaintiffs to believe that the loan committee

___

would approve its proposal and because they were told that $200,000 of the $250,000 "fee" would be applied to the Loan balance.

22. By mid-July, 2008, Warren Park still did not have the City's approvals. Warren Park did, however, have a second offer to buy 10 acres at the $10.80 per square foot price, which is a value of approximately $5,000,000. Warren Park therefore went back to GE the week of July 14, 2008 with a request to extend the time period by when it would have to have the City's approval and to offer to pay the sales proceeds from the 10 acre land sale to GE. After all, selling the land and repaying the loan is the end game, and Warren Park's offer was to do just that. When Warren Park approached GE in July of 2008, GE initially said that Warren Park's proposal sounded good but that they would just need the loan committee's stamp of approval.

23. By July 18, 2008, without explanation, GE notified Warren Park that it would not extend or alter the Loan and that if Warren Park did not (a) pay an additional $2,500,000 by July 25, 2008; (b) agree to move up the maturity date from May 2009 to January 2009; and, (c) agree that no further draws on the loan would be allowed, GE would begin foreclosure proceedings. Warren Park again tried to meet with GE, who flatly refused to even meet with Warren Park.

24. In today's lending market, Warren Park would have never have been able to re-finance the Loan between July 18, 2009 and January of 2009. Likewise, the development would not have been in a position to be fully sold by that time either. GE knew this. GE's plan, clearly, was for Warren Park to pay $2,500,000, make no further draws on the Loan and agree to move up the maturity date so that Warren Park would

___

never be able to meet it, which will ultimately give GE the chance to foreclose in January 2009, $2,500,000 richer! GE would, therefore, get more of Warren Park's money plus get the Property, which is currently worth approximately $39,600,000, for only the discounted amount it paid to Merrill Lynch for the Loan and any Loan disbursements GE has made in the last few months, netting a profit to GE of approximately $20,000,000. GE's refusal to modify the loan can only be explained by one word – "greed." Obviously, GE's loan is more than fully secured by the Property, even if 10 acres of it is sold and the proceeds from the sale of the 10 acres are used to pay down the Loan.

25. Warren Park, of course, could not agree to these onerous, debilitating terms. In addition to the $34,800,000 in loan proceeds, Warren Park raised approximately $8,000,000 in equity from investors. Warren Park has a substantial amount of money invested in this project. Warren Park, therefore, not only stands to lose the equity it has accumulated in the Property, but also the funds invested thus far in the project and its investor's funds. GE knows this as well.

26. A lender who is acting in good faith does not refuse to meet with its borrower. A lender acting in good faith does not try to extort early and more favorable repayment terms and charge the borrower exorbitant fees for the "privilege" of entering into a deal that would undoubtedly lead to default. A lender acting in good faith does not stop making draws and bring a project to a stand-still when the borrower is offering to meet sale conditions. A lender acting in good faith does not collect $250,000 in so-called "fees" to even consider (and then, ultimately, deny) a borrower's requested loan modifications.

# IV.  CAUSES OF ACTION

## FIRST THROUGH FOURTH CAUSES OF ACTION – COMMON LAW FRAUD, FRAUD IN THE SALE OF REAL ESTATE, FRAUD BY NONDISCLOSURE AND FRAUD IN THE INDUCEMENT

27. Plaintiffs incorporate by reference all paragraphs above as if set forth verbatim herein.

28. The Defendants committed fraud to the detriment of Plaintiffs by making material misrepresentations and omissions to Plaintiffs about the Loan and related documents, its intentions to extend or modify the Loan and its intention to credit a portion of the extortive "fees" Warren Park paid toward the balance of the Loan. Defendants materially omitted the details of their predatory practices and the plan to squeeze as much cash out of Plaintiffs before executing their "loan to own" plan to foreclose on the Property.

29. When Defendants made the above misrepresentations and omissions, they knew that the misrepresentations were false and the omissions material, or they made said misrepresentations and omissions recklessly and as a positive assertion, but without any knowledge of the truth of the misrepresentations.

30. Defendants made the above misrepresentations and material omissions with the intention that Plaintiff rely and act upon them.  Plaintiffs reasonably relied on these representations and omissions when the entered into this deal, again when Warren Park continued to work on the project and entered into the forbearance agreement and when Plaintiffs raised the capital and paid $500,000 to GE.

31. Defendants' conduct also constitutes Fraud in the Inducement, and but for those representations and omissions, Plaintiffs would never have entered into the Loan and related documents, the forbearance agreement or paid an additional $500,000. Defendants' conduct also constitutes fraud by non-disclosure and fraud in the sale of real estate pursuant to Tex. Bus. & Comm. Code § 27.01 *et seq*.

32. Accordingly, Defendants' actions have benefited Merrill Lynch and GE and proximately cause Plaintiffs actual, consequential, incidental, special and exemplary damages in excess of the minimum jurisdictional limits of this Court for which they hereby sue.

**FIFTH CAUSE OF ACTION – NEGLIGENT MISREPRESENTATION**

33. Plaintiffs incorporate by reference all paragraphs above as if set forth verbatim herein.

34. Defendants negligently misrepresented the matters detailed above in a transaction in which Defendants had a pecuniary interest. Defendants provided the false information for the guidance of Plaintiffs in their business decisions, and Defendants did not exercise reasonable care or competence in obtaining or communicating the information to Plaintiffs.

35. Plaintiffs have suffered pecuniary loss by justifiably relying on the representations and omissions of the Defendants.

36. Accordingly, Defendants actions have proximately cause Plaintiffs actual, consequential, incidental, special and exemplary damages in excess of the minimum jurisdictional limits of this Court for which they hereby sue.

**SIXTH CAUSE OF ACTION – CIVIL EXTORTION / ECONOMIC DURESS**

37. Plaintiffs incorporate by reference all paragraphs above as if set forth verbatim herein.

38. GE did seek and continues to seek to purposefully appropriate the property of Plaintiffs without that Plaintiffs' effective consent by wrongfully threatening to impair Plaintiffs' credit and business reputation and otherwise inflicting harm on Plaintiffs as set forth herein. GE has no legal right or legal grounds to make a demand for the Property of Plaintiffs as they have done, and such threats create an apprehension in the threatened Plaintiffs that GE has an immediate intention and ability to carry out their threats.

39. Accordingly, GE's actions have proximately caused Plaintiffs actual, consequential, incidental, special and exemplary damages in excess of the minimum jurisdictional limits of this Court for which they hereby sue.

**SEVENTH AND EIGHTH CAUSES OF ACTION – CONVERSION AND CIVIL THEFT**

40. Plaintiffs incorporate by reference all paragraphs above as if set forth verbatim herein.

41. Plaintiffs had an ownership interest in the Property, the funds paid to GE and other assets.

42. GE, by stealing and/or wrongfully transferring these items to themselves, wrongfully and with malice exercised dominion and control over Plaintiffs' assets.

43. GE's self-dealing acts and seizures of Plaintiffs' property, without lawful justification, amount to conversion, common law civil theft and statutory civil theft, for which Plaintiffs suffered actual, incidental, consequential and special damages in excess of the minimum jurisdictional limits of the Court for which they hereby sue.

**NINTH CAUSE OF ACTION – PROMISSORY ESTOPPEL**

44. Plaintiffs incorporate by reference all paragraphs above as if set forth verbatim herein.

45. Pleading in the alternative if same be necessary, GE made a promise to Plaintiffs that if they paid the fees as set forth herein that GE would agree to modify the Loan and accept Plaintiffs' proposal. Plaintiffs did so to their detriment. Plaintiffs' reliance was foreseeable by GE, and injustice can only be avoided by enforcing their promise.

46. Accordingly, Plaintiffs suffered actual, consequential and special damages in excess of the minimum jurisdictional limits of this Court for which they hereby sue.

**ELEVENTH CAUSE OF ACTION – ASSUMPSIT**

47. Plaintiffs incorporate by reference all paragraphs above as if set forth verbatim herein.

48. Pleading in the alternative if same be necessary, GE has money that in equity and good conscious belongs to Plaintiffs.

49. GE refused to pay that money to Plaintiffs. Accordingly, Plaintiffs suffered actual, consequential and special damages in excess of the minimum jurisdictional limits of this Court for which they hereby sue.

**TWELTH CAUSE OF ACTION – CIVIL CONSPIRACY**

50. Plaintiffs incorporate by reference all paragraphs above as if set forth verbatim herein.

51. Defendants acted in concert and conspired together to commit the fraudulent and tortious acts described herein. Accordingly, the Defendants should be held jointly and severally liable for any damages awarded to Plaintiff as a result of this action.

**THIRTEENTH CAUSE OF ACTION – ACCOUNTING AND CONSTRUCTIVE TRUST**

52. Plaintiffs incorporate by reference all paragraphs above as if set forth verbatim herein.

53. Because Defendants received funds from Plaintiffs under false pretenses, it is unconscionable for Defendants to retain possession of such monies and interests in same. Unless a constructive trust is imposed upon the monies and assets acquired as a result of the acts of Defendants, Defendants will be unjustly enriched at the expense of Plaintiffs.

54. The exact nature and extent of Defendants' illicit gains from its fraudulent practices and schemes are not completely known to Plaintiffs and cannot be determined without an accounting of the transactions made by Defendants. Moreover, Plaintiffs

cannot determine if or how certain payments have been applied to the Loan balance. An investigation of such transactions is necessary since there is no adequate remedy at law, and Plaintiffs therefore demand a full accounting of all payments made to Merrill Lynch and GE and all disbursements made under the Loan.

## V. DAMAGES

55. Plaintiffs incorporate by reference all paragraphs above as if set forth verbatim herein. Defendants' conduct caused Plaintiffs the following damages:

    a. The amount Plaintiffs have paid GE in "fees" and Plaintiffs' loss of use of that money;

    b. Lost profits;

    c. Plaintiffs' equity in the Property;

    d. The fees and expenses incurred by Plaintiffs in the transactions related to the Property, including its efforts to obtain entitlements from the City of Frisco;

    e. Costs of suit;

    f. Pre- and post-judgment interest; and,

    g. Attorneys' fees.

56. Without waiving any other remedies available to Plaintiffs and without making an election of remedies, Plaintiffs were induced by Merrill Lynch's fraud to enter into the Loan and related agreements, and upon learning of said fraud, Plaintiffs now seek to avoid said contract, repudiates said contract and seeks rescission of said contract.

___

Plaintiffs' Original Complaint -- Page 17 of 20

57. Plaintiffs' damages are in excess of the minimum jurisdictional limits of the Court in which this action was originally filed.

## VI. ATTORNEYS' FEES

58. Plaintiffs incorporate by reference all paragraphs above as if set forth verbatim herein.

59. Pursuant to Texas Civil Practice & Remedies Code, including Chapters 37, 38 and 134 and Chapter 27 of the Texas Business and Commerce Code, Plaintiffs seek recovery of all reasonable attorneys' fees and costs incurred in connection with this matter.

## VII. EXEMPLARY DAMAGES

60. The acts and omissions of Defendants complained of herein were committed knowingly, willfully, intentionally, with actual awareness, and with the specific and predetermined intention of enriching Defendants at the expense of Plaintiffs. In order to punish Defendants for such unconscionable overreaching and to deter such actions and/or omissions in the future, Plaintiffs also seek recovery from Defendants for exemplary and treble damages as provided by the Texas Civil Practice and Remedies Code, including without limitation Chapter 41.

## VIII. IMPACT ON THE DEBTOR'S ESTATE

70. Debtor's bankruptcy is a single asset real estate case. GE is the primary creditor. Therefore, liquidation of the largest claim against that asset and determination of the debtor-creditor relationship is paramount to Debtor's reorganization efforts and

___
Plaintiffs' Original Complaint -- Page 18 of 20

determinative of how the case will be administered in bankruptcy court. Indeed, proposal of and confirmation of an effective plan of reorganization and treatment of the Debtor's creditors is dependent upon this court's resolution of these claims and causes of action.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs respectfully request that they be granted judgment, including rescission, as requested herein and recover all costs, as well as reasonable and necessary attorneys' fees, together with all other and further relief, both at law and in equity, to which Plaintiffs may show themselves to be justly entitled.

Respectfully submitted,

By: /s/ Vickie L. Driver
    Gerrit Pronske
    State Bar No. 16351640
    Vickie L. Driver
    State Bar No. 24026886
    **PRONSKE & PATEL, P.C.**
    1700 Pacific Ave., Suite 2260
    Dallas, TX 75201
    214-658-6500 (Telephone)
    214-658-6509 (Telecopier)

    **ATTORNEYS FOR PLAINTIFF AND DEBTOR**
    Margaux Warren Park Partners, Ltd.

    and

By: /s/ Lawrence J. Friedman
Lawrence J. Friedman
State Bar No. 07469300
James Robert Krause
State Bar No. 11714525
Melissa Kingston
State Bar No. 24013435
**FRIEDMAN & FEIGER, LLP.**
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
(972) 788-1400 (Telephone)
(972) 788-2667 (Telecopier)

**ATTORNEYS FOR PLAINTIFFS**
Warren 91, LLC, Today Realty Advisors, Inc., Eric Brauss and Donald Silverman